[No. 10481. Department Two. April 14, 1913.]

CITY CAB, CARRIAGE & TRANSFER COMPANY, *Respondent*, v. Z. E. HAYDEN, *as Commissioner etc., et al, Appellants.*[1]

APPEAL—DECISIONS REVIEWABLE—CESSATION OF CONTROVERSIES. On an appeal from a judgment enjoining the enforcement of omnibus regulations at a depot stand, there is no cessation of the controversy from the fact that the appellants, being unable to supersede their appeal, promulgated new regulations.

INJUNCTION—WHEN LIES—ENFORCEMENT OF LAWS. Injunction lies to test validity of police regulations of omnibuses at a depot, since the legal remedies of submitting to an arrest and a civil action for damages are inadequate, and inoperative as to the future.

MUNICIPAL CORPORATIONS — POLICE REGULATIONS—HACKMEN—DE-POTS. It is within the police power of a city to regulate solicitation by, and the stands for, hackmen at a railroad depot.

MUNICIPAL CORPORATIONS—POLICE REGULATIONS — HACKMEN—DE-POTS—REASONABLENESS. Rules regulating omnibuses at a depot stand are not unreasonable in that certain vehicles are assigned to speci-fied spaces, some of which are of much more value than the others, if they are reasonable so far as the rights of the public are con-cerned.

Appeal from a judgment of the superior court for Spokane county, Pendergast, J., entered May 20, 1912, upon findings in favor of the plaintiff, in an action for an injunction. Re-versed.

*H. M. Stephens* and *Ernest E. Sargeant (Alex M. Winston,* of counsel), for appellants.

*John M. Gleason* and *A. G. Gray,* for respondent.

FULLERTON, J.—The respondent, who was plaintiff below, brought this action against the appellants to enjoin them from enforcing certain rules and regulations promulgated by the respondent Hayden, as commissioner of public safety of the city of Spokane, intended for the regulation and control of hacks, omnibuses, and other vehicles, and persons in charge of the same, while attending upon the arrival of trains at the

[1]Reported in 131 Pac. 472.

depot of the Northern Pacific Railway Company in that city. The respondent had a decree in the court below, and this appeal is prosecuted therefrom.

The tracks of the Northern Pacific Railway Company extend through the city of Spokane in an easterly and westerly direction. Its depot grounds are practically in the heart of the city; perhaps a little to the easterly thereof. The exit gates for passengers therefrom open into a street called First avenue, which also extends easterly and westerly, practically paralleling the railway tracks—the exit gates opening into First avenue at a point opposite the junction of Bernard street therewith. Passengers leaving the depot grounds through these gates for the hotels of the city usually turn west along First avenue, using the sidewalk on the south side of the street. On April 23, 1912, the city of Spokane by ordinance empowered its commissioner of public safety to make and establish rules and regulations for the control of hacks, omnibuses, cabs, express wagons and other vehicles, and persons in charge of the same, while attending at or near the several railway stations in that city to meet passengers on the incoming trains; especially empowering him to designate "the place or places at which hacks, omnibuses, cabs, express wagons, and other vehicles, and each and every vehicle aforesaid shall be allowed to stand at or near such railway stations, and also make such other rules and regulations as may be necessary for the regulation and control by the police department of all hacks, omnibuses, cabs, express wagons, and other vehicles, and persons in charge of the same, at and near railway stations in the city of Spokane."

Acting pursuant to the authority vested in him by the ordinance, the commissioner of public safety prepared and put into effect for the control of vehicles at the depot of the Northern Pacific Railway Company the following regulations:

"Northern Pacific Depot Traffic Regulations.

"To be enforced from and after midnight, April 26th, 1912.

"All busses and other vehicles exclusively for hotel passenger service shall stand back to the curb on the south side of

First Avenue, and west of the west side of the exit gate, such space reserved to extend one hundred (100) feet west on said curb line. All such conveyances to conspicuously display a card giving names of hotels which they are representing and stating 'for Hotel Passenger Service Only.' Each vehicle shall have eight feet space on curb line, spaces to be numbered from one up, commencing at east end. No hotel shall be represented in this space by more than one carrier.

"The assignment to positions shall be as follows: (1) Spokane Hotel, (2) Pacific Hotel, (3) Pedicord Hotel, (4) Ridpath Hotel, (5) Victoria Hotel, (6) Halliday Hotel, (7) Empire Hotel, (8) Coeur d'Alene Hotel, (9) Fairmont Hotel, (10) Majestic-St. Nicholas, (11) Calumet Hotel.

"Each of the above represented by individual bus or taxicab. Any other hotels wishing space in this reserve shall be assigned to the west end in the order of their application. Nothing in these rules shall be construed as a concession to a common carrier and bona fide contract with hotel or hotels must be had to entitle representatives to position in this reserve. Persons in charge to stand immediately at the rear of their vehicle and soliciting in an ordinary tone of voice to be allowed in this space.

"All vehicles carrying passengers for rooming-houses and hotels not regularly employed and also catering to regular passenger traffic shall stand back to the curb line and occupy a position on the east side of Bernard street north of the north line of First avenue and immediately to the rear of vehicles not over three feet from curb line. No loud or boisterous calling to be permitted.

"No express wagons, drays, hacks, automobiles, private carriages, taxicabs, transfer wagons or any kind of vehicle will be permitted on south side of First avenue east of the west line of the west exit gate except the transfer bus and to load or unload baggage or passengers, and no soliciting of business shall be done while loading or unloading baggage or passengers.

"Expressmen when calling for baggage at the baggage room door, first in, first out, system, will first secure the baggage at the baggage room door and then drive up with their vehicle and load such baggage as soon as possible and drive away. It shall not be permitted for any driver of such express wagon, his assistant or any one accompany-

ing him, to solicit any new business while at or on the
depot platform.                        Z. E. Hayden,
                "Commissioner of Public Safety."

The trial court found that, when regulations were first
promulgated for the control of vehicles attending at the
depot, the Hotel Spokane was the only hotel in the city then
operating an omnibus, and that it was then assigned to the
position it now occupies, and that thereafter as the hotels
named installed such omnibuses they were accorded spaces to
the westward of the space assigned to the Hotel Spokane in
the order of their applications.

After the promulgation of the order by the commissioner
of public safety, the respondent obtained a contract with a
number of hotels in the city of Spokane, not listed in the or-
der of the commissioner, granting it the exclusive right to
carry passengers to and from such hotels and the depot
named, and on its making this fact known to the commissioner,
was assigned a space immediately to the west of the space last
assigned in the commissioner's order before quoted.    The
evidence demonstrated, and it was found by the court, that
the pecuniary value of these spaces as locations decrease
rapidly as they proceed westward.    It was found that travel-
ers from the arriving trains desiring a hotel usually found a
satisfactory one before they reached the end of the line of
carriages, and that while the first place occupied by the
omnibus of the Hotel Spokane was an extremely desirable
space, the one to the extreme westward was of little or no
value for picking up stray guests who had no definite hotel
selected before their arrival at the depot.

The respondent refused to recognize the commissioner's
authority in the premises and sought to place its omnibus in
any vacant space it found on arriving at the depot grounds,
regardless of the fact that such space had been assigned to
the use of the vehicle from another hotel.    On its driver be-
ing forced to withdraw from such space and being threatened
with arrest if he persisted in placing his vehicle in any as-

signed space other than his own, this action was brought for an injunction, as before stated. The trial court found the regulation unreasonable and void, and entered a decree setting it aside.

On perfecting their appeal, the appellants sought to supersede the effect of the decree pending the hearing in this court, making application both to the lower court and this court. They were denied the right, and thereupon promulgated a new order in which the omnibuses representing the several hotels named were assigned spaces as before, but for limited times only, the one at the head of the line being required to drop to the foot thereof at the end· of every month and the others moving one space easterly. The respondent, showing the foregoing facts by affidavit, moves to dismiss this appeal on the ground that there has been a cessation of the controversy. But manifestly the motion is not well taken. The appellants have prosecuted their appeal with diligence, and all that has been done looking to the regulation of the vehicles attending the arrival of trains at the depot in question has been done through necessity, because of the inability of the appellants to supersede the decree and thus keep in force the regulations theretofore in force. This does not amount. to an acceptance of the decree, and unless there has been such an acceptance there is no cessation of the controversy. The motion to dismiss is denied.

The appellants first contend that this action will not lie, since injunction is not the proper remedy to test the validity of police regulations and police ordinances. It may be that the weight of authority in other jurisdictions sustains this view, but we have heretofore felt constrained to adopt the opposing rule. The legal remedies of submitting to an arrest or bringing an action in damages are generally inadequate, since judgments obtained thereon are incapable of being made operative against future repetitions of the acts giving rise to the action, while the remedy by injunction is operative throughout all future time. *Carl v. West Aberdeen Land &*

*Imp. Co.*, 13 Wash. 616, 43 Pac. 909; *Walker v. Stone*, 17 Wash. 578, 50 Pac. 488; *Smith v. Mitchell*, 21 Wash. 536, 58 Pac. 667, 75 Am. St. 858; *Hillman v. Seattle*, 33 Wash. 14, 73 Pac. 791; *Ingersoll v. Rousseau*, 35 Wash. 92, 76 Pac. 513; *Wilcox v. Henry*, 35 Wash. 591, 77 Pac. 1055; *Dempsie v. Darling*, 39 Wash. 125, 81 Pac. 152.

The more important question is whether the regulations promulgated by the commissioner of public safety are valid. The general power of municipalities to regulate and control the conduct of hackmen and others soliciting the privilege of carrying travelers from railroad depots to their place of destination cannot, we think, be successfully questioned. This the city must do in the interest of good order, public peace and safety. It is a matter of common knowledge that not only are passengers themselves subjected to unnecessary and disagreeable annoyances at such places if hackmen are left to pursue their calling unrestrained, but that disorderly brawling and breaches of the peace often occur among the hackmen themselves, and sometimes between a hackman and a traveler who declines to submit quietly to some particularly vicious insult. The power therefore arises from the necessities of the case, and the only debatable question is whether the particular regulation is reasonable.

Whether or not it is a reasonable regulation to require hackmen to keep themselves and their vehicles within an assigned space while soliciting for hotel patronage and passenger traffic at a depot on the incoming of a passenger train seems not to have been submitted to many courts, but those passing upon the question are unanimous in the conclusion that such regulations are, generally speaking, reasonable. Thus, in Minnesota, the common council of a municipality passed an ordinance providing, that "no owner or driver of any . . . . hack . . . shall make any stand or stopping place, with or without his vehicle, while waiting for employment at any place on any street or public ground adjacent to any railroad or railway depot, . . . except in

the place or places designated by the police officer on duty, from time to time, at such railway depot or station." The court held the ordinances reasonable, saying that the "assigning of a particular place to each hackman would appear to be peculiarly and happily adapted to the preservation of order. By this practice every one is informed exactly where his proper place is, so that the strife and contention for particular places which would otherwise ensue is measurably, at any rate, prevented." *St. Paul v. Smith*, 27 Minn. 364, 7 N. W. 734, 38 Am. Rep. 296. So in Indiana the city of Evansville passed an ordinance authorizing the depot marshal to designate the places where hacks and other vehicles should stand while awaiting for passengers at the railroad depots. The validity of the ordinance was called in question by a hack driver who had been arrested for violating the marshal's orders, and the case brought to the supreme court of that state. Passing upon the question the court said:

"There can be no question but that the ordinance authorizing the depot marshal to prescribe the places where omnibuses, hacks and other vehicles should stand at the railroad depot, and requiring drivers to obey the directions of police officers in regard to the places which their respective vehicles should occupy, was a proper regulation, and one which the municipal authorities had the power to pass." *Veneman v. Jones*, 118 Ind. 41, 20 N. E. 644, 10 Am. St. 100.

In Massachusetts the city of Boston passed an ordinance providing that, "No owner, driver, or other person having charge of any hackney carriage, shall stand with such carriage to solicit passengers in any street, square, lane, alley, or public place within the city, other than the place assigned to such carriage by the board of aldermen, under a penalty not exceeding twenty dollars for each offense." One Matthews was accused and convicted of having violated the ordinance, by soliciting in the depot away from the place assigned to him, and on appeal the court held the ordinance valid. *Commonwealth v. Matthews*, 122 Mass. 60.

In Kansas under an ordinance of the city of Ottawa the city marshal designated the positions to be occupied by each vehicle while the drivers were waiting for passengers. One Bodley, a licensed hackman, ignored the order, and was convicted of a violation of the ordinance. On appeal the court affirmed the conviction using this language:

"A regulation of hackmen and others who solicit passengers at railway stations is in the interest of peace and good order, and obviously essential to the convenience and comfort of travelers. The placing of them under the direction and control of the city marshal is a reasonable and practical method of regulation. The power to designate the position for hackmen and solicitors of passengers must be placed in some one, and no reason is seen why it may not be properly given to the marshal, a peace officer, whose duty it is to preserve order throughout the city. We think there was power to regulate hackmen, and that it has been exercised in a reasonable and valid way." *Ottawa v. Bodley*, 67 Kan. 178, 72 Pac. 545.

These cases make it clear that the mere fact that the regulations provide for the assignment of each vehicle to a particular place does not render them unreasonable; hence, that result can follow in the present case only because the places assigned are not of equal value as positions for the solicitation among the incoming passengers for patronage of the hotel they represent. But it has seemed to us that this is not sufficient to condemn the regulation. The solicitation of incoming passengers for this purpose has nothing to do with the public weal, nor with the duty of hackmen as common carriers. The solicitation is a purely private business pertaining solely to the private emolument of the solicitor or his employer, in which neither the traveler, the municipality, nor the general public has any interest. It would seem to follow that a regulation for the public interests, concededly reasonable in so far as public rights are concerned, should not be rendered unreasonable simply because it confers upon one person the advantage over another in the prosecution of a

private business.   We do not think it does so and are constrained to hold that the regulations complained of are within the power of the city authorities.

The respondent, in support of the decree of the trial court, cites and relies upon the cases holding that railroad companies may not grant to one person, or company of persons, the exclusive privilege of going onto its depot grounds to solicit from passengers the right to convey them from the depot to their point of destination.   But it has seemed to us that these cases are not in point on the question before us except perhaps only remotely by way of analogy.   If, however, the fact were otherwise, we could not follow the principle announced by them, as in our judgment they do not represent either the weight of authority or the better reasoning on the question discussed.   The cases pro and con on the subject will be found collected in the opinion of Frick, J., in the case of *Oregon Short Line R. Co. v. Davidson,* 33 Utah 370, 94 Pac. 10, 16 L. R. A. (N. S.) 777.

These considerations require that the judgment of the trial court be reversed, and the cause remanded with instructions to enter a judgment in favor of the appellants, defendants below, to the effect that the plaintiff take nothing by its action, and for costs.

It is so ordered.

MOUNT, MAIN, and MORRIS, JJ., concur.